IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

WESTERN DIVISION


UNITED STATES OF AMERICA


V.                                    CRIMINAL NO. 5:20-cr-1-DCB-LRA

ROY RAY, III                                              DEFENDANT

ORDER

This matter is before the Court on the Defendant Roy Ray,
III ("Ray")'s Motion to Suppress. [ECF No. 22]. On July 14,
2020, the Court held a hearing on the Motion. The Defense
requested time to submit additional briefing, which the Court
granted. Having heard from the parties, considered the Motion,
supplemental briefing, and applicable statutory and case law,
the Court finds as follows:

BACKGROUND

On August 1, 2019, at approximately 11:00 a.m., six deputies
with the Adams County Sheriff's Department – Deputy Thomas
McGinty, Corporal Luke Brumfield, Sergeant Lee Best, Lieutenant
Stanley Searcy, Captain Keith Myles, and Major Shane Daugherty –
traveled to the home of Ashley Coon and her son Triston. The
officers were looking for a man named Calvin Perry, also known as
Cotton. After arriving at the Coon's home, Corporal Brumfield

1

knocked on the side door of the house. Ray opened the door and allowed the deputies entry. Triston and his girlfriend were in the house, but Cotton was not there.

Deputies knew of an outstanding arrest warrant issued by the Mississippi Department of Corrections ("MDOC") for Ray. Accordingly, Deputy McGinty arrested Ray, handcuffed him, and escorted him out of the house, where he sat on the back of a pickup truck. Major Daugherty and Captain Myles stayed with Ray while the other deputies were inside the house. Ray was not Mirandized when he was arrested.

While Ray was outside, Deputy McGinty went back into the house and asked Triston if Ray possessed a gun and, if so, where it was located. Triston replied, "I know he's got one, I don't know where it's at." See Gov't Ex. 2, Bodycam Video, ECF No. 33-2, at 9:58. Deputy McGinty reminded Triston that a gun could not be in the home because Triston's mother is a convicted felon. Still, Triston insisted he had not recently observed Ray with a gun.

Prior to reading Ray his Miranda rights, Deputy Thomas McGinty asked the Defendant (a) if a gun was inside the house, (b) where the gun was located, and (c) who possessed the gun. Ray told Deputy McGinty that he possessed a gun and that it was on the couch. Deputy McGinty went back in the house and recovered the gun off the couch. Ray was then transported to the Sheriff's Office.

Later that day, at approximately 6:30 p.m., Deputy McGinty interviewed Ray at the Sheriff's Office. Before starting the interview, Deputy McGinty provided Ray with water and administered the full range of <u>Miranda</u> warnings. He ensured that Ray understood each right. Moreover, Deputy McGinty advised Ray that he did not have to answer any questions, and that he could stop the interview at any time.

During this encounter, Ray wore an orange jail uniform. The interview was relaxed and involved only Deputy McGinty and Ray. The tone of the interview was conversational, and it lasted approximately twenty minutes. During the first fifteen minutes, Deputy McGinty's questions focused on the whereabouts and activities of Cotton, including drug activity and property presumably in Cotton's possession.

During these first fifteen minutes, Deputy McGinty neither questioned Ray about the gun nor confronted Ray with his previous statements made at Triston's house. While informing Deputy McGinty of different activities involving Cotton, Ray voluntarily told Deputy McGinty that he possessed the gun found earlier that day because some people had a problem with him. [ECF No. 35] at 4. Deputy McGinty then asked follow-up questions focusing on the person who provided Ray the gun.

Discussion

**Pre-Miranda Statements**

3

The Defendant seeks to suppress his pre-Miranda statements elicited at the Coon residence. In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court established that prior to a criminal suspect's custodial interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The prosecution may not "use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. The Government recognizes this and has stated that it does not intend to use these statements during its case-in-chief, as the statements were made after Ray was handcuffed and before he was Mirandized. [ECF No. 35] at 4. Accordingly, the Court finds that the statements made prior to Ray being administered his Miranda warnings should be suppressed.

**Post-Miranda Statements**

Ray claims that his statements made at the Sheriff's Office should be suppressed for two reasons: (1) the statements were obtained using a coercive two-step strategy; and (2) that United States v. Tovar, 719 F.3d 376 (5th Cir. 2013) requires

4

suppression. The Court will first address the Defendant's claim that law enforcement utilized a coercive two-step strategy.

I.   Coercive Two Step Strategy

Where a "two-step interrogation technique was used in a calculated way to undermine the Miranda warning," "post warning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the post warning statement is made." United States v. Gonzalez, No. 19-50725, 2020 WL 3053390, at *7 (5th Cir. 2020) (quoting Missouri v. Seibert, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring in the judgment)); see also, e.g., United States v. Nunez-Sanchez, 478 F.3d 663, 668 (5th Cir. 2007). This forbidden two-step strategy "involves an interrogator relying on the defendant's prewarning statement to obtain the postwarning statement used against [him] at trial, by confronting the defendant with [his] inadmissible prewarning statements and pushing [him] to acknowledge them." Id. (quoting United States v. Delgado-Arroyo, 358 F. App'x 530, 532 (5th Cir. 2009)(per curiam)(cleaned up)).

"If we determine that agents employed a calculated strategy to evade Miranda with the proscribed two-step interrogation, we must determine if they took curative measures 'to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver.'" Id. (citing Seibert, 542 U.S. at 622 (Kennedy, J.,

5

concurring in the judgment)). But, if we conclude that agents used no such tactic, the admissibility of the warned statements is "governed by the principles of Elstad." Id.

Therefore, as a preliminary matter, the Court must first determine whether law enforcement employed the two-step interrogation strategy prohibited by Seibert. Ray argues that the agents deliberately waited to give Miranda warnings until he had made an incriminating statement. The Defendant claims that a conversation between Deputy McGinty and his supervisor, Major Daugherty, "reveals a police strategy adapted to undermine the Miranda warnings." [ECF No. 32] at 7. As the Defendant writes in his supplemental briefing:

> "Deputy McGinty knew that he was supposed to Mirandize Mr. Ray before asking him about the gun, but he did not. Then we hear Deputy McGinty and Major Daugherty discussing Mirandizing Mr. Ray at the Sheriff's Office and obtaining another statement from him. Mr. Ray fell into their trap when brought up the gun during the interrogation at the Sheriff's Office. But even if he had not brought up the gun, Deputy McGinty would have. These facts fit squarely into the prohibited 'question first' tactic. Therefore, Mr. Ray's second statement about possessing a gun must be suppressed."

Id. at 11-12. Under cross-examination, Deputy McGinty consistently testified that he did not employ a strategy to undermine the protections of Miranda. He testified that he did not know if Ray possessed a gun, but that he suspected as much. Notably, Ray was

arrested and handcuffed for a MDOC violation unrelated to gun possession.

Prior to finding the gun, Officer McGinty did not know if Ray would or would not be charged with being a felon in possession. Major Daugherty informed Deputy McGinty that, if he found a gun, he had to Mirandize Ray because, at that point, he would be charged with a crime. The Defendants assert that this was a "directive to get incriminating statements and evidence from Mr. Ray, then Mirandize him, then interview him and get a second statement." [ECF No. 32] at 8.

Ray acknowledges that Major Daugherty's instructions to Deputy McGinty were to cure any potential Miranda problems. [ECF No. 32] at 15("Also, we know from Major Daugherty's directions to Deputy McGinty that they were trying to cure the Miranda problem by taking Mr. Ray to the Sheriff's Office and obtain a second statement from him after giving the Miranda warning."). Deputy McGinty has been employed with the Sheriff's Office for approximately two years. As his supervisor, Major Daugherty was likely making sure that Deputy McGinty did not run afoul of Miranda. The Court is not persuaded by the Defendant's argument that law enforcement utilized a police strategy to undermine the protections afforded by Miranda. There are multiple explanations, many which have been presented to the Court, that would justify

the conversation between Major Daugherty and Deputy McGinty about the need to Mirandize Ray after finding the gun.

Officer McGinty admitted that it was his practice not to Mirandize persons who are arrested on a warrant until they are at the Sheriff's Office. However, he explained that he waited because he did not typically plan on asking any questions of persons who are arrested on an outstanding warrant until they are at the Sheriff's Office in the interview room. He also noted that he does not Mirandize suspects if he is not planning on charging them with a crime.

The Court finds United States v. Lim to be instructive to these facts. See 897 F.3d 673 (5th Cir. 2018). In Lim, officers placed the alien defendant under formal arrest before questioning him, he was not Mirandized until after the initial questioning, during his pre-Miranda questioning he admitted to having a gun and instructed the officers where to find it, the defendant was then Mirandized at which point he answered questions about where he obtained the gun. See Lim, 897 F.3d at 690. Furthermore, the questioning officer admitted that it was his standard policy not to Mirandize an alien until after it appeared that criminal charges might be filed. See id. at 692.

The Fifth Circuit accepted the officer's Miranda policy, noting that the officer "had that policy because the cases against these [alien] arrestees were completed, so he is not investigating

or attempting to elicit incriminating responses." Id. at 692. The Fifth Circuit noted that the evidence suggested that Lim was calm and cooperative, and the agents did not act aggressively or with hostility. See id. at 692. Despite the questioning officer's Miranda policy, the Court found that there was nothing in the circumstances or nature of the questioning to indicate coercion or a deliberate attempt to employ a two-step strategy. See id.

In the instant case, Officer McGinty noted that he did not Mirandize persons who have been arrested on an outstanding warrant until they were at the police station. The reasoning behind this delayed reading of Miranda rights to a person arrested on a warrant is similar to that in Lim, inasmuch as there is no immediate need to investigate or elicit incriminating statements when a person is to be arrested pursuant to a warrant. Instead of asking questions at the scene, officers often wait until they are in an interview room that has recording/video capabilities and that contains the proper Miranda waiver forms. However, like in Lim, when Officer McGinty asked if there was a gun and then found one belonging to Ray at the scene, the circumstances changed, and Miranda warnings were then given. After Ray was Mirandized, he was taken directly to the Sheriff's Office where he was held in a jail cell for approximately six and a half hours until Deputy McGinty proceeded to interrogate him.

Upon careful review of the exhibits, the Court notes that in the interrogation by Officer McGinty the defendant was being questioned about his knowledge involving property allegedly or possibly stolen by someone else. It was during this time in the interview that Ray acknowledged that he was in possession of a firearm. His statement was voluntary, and there is no evidence whatsoever of coercion or any other oppressive tactics which have been identified in other cases which have resulted in the suppression of evidence. The Court observed that at all times Ray was both calm and cooperative and was not the subject of aggressive or hostile coercive strategy on the part of law enforcement personnel.

Ray does not claim that Deputy McGinty was hostile or employed exhaustive, psychological tactics during either interview. Further, Ray was not confronted with his pre-Miranda statements, or pressured into accepting or repeating his pre-Miranda statements regarding his knowledge and possession of the gun during his later, post-Miranda interview. The record shows that Ray voluntarily offered the information regarding the gun when being questioned about Cotton, the original target of the deputies' earlier mission. See Gonzalez, 2020 WL 3053390, at *8(stating that the "record shows that agents did not confront [the defendant] with the statements that had been made" prior to being read his Miranda rights.)

Moreover, there were approximately six hours between the two interrogations. Stated plainly, the interrogations were not a continuous, coercive interrogation done without a substantial break or meaningful administration of Miranda warnings. It is clear from the exhibits that the tone was conversational. [ECF No. 25] at 3. See Gonzalez, 2020 WL 3053390, at *8("the circumstances, nature, and tone of the questioning do not suggest 'that coercion or other improper tactics were used'")(quoting Nunez-Sanchez, 478 F.3d at 668)). Having carefully reviewed the exhibits and listened to the testimony of the arresting and interrogating officer, the Court is not persuaded that law enforcement utilized a coercive two-step strategy to trap Ray into adopting his pre-Miranda statements after being read his Miranda rights.

However, even assuming arguendo that a deliberate two-step strategy was used, there were sufficient curative measures taken to permit the introduction of a post-Miranda statement. See Seibert, 542 U.S. at 603. In his concurrence, Justice Kennedy explains effective curative measures:

> "Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."

11

_Seibert_, 542 U.S. at 622(Kennedy, J., concurring in the judgment). In this case, there were approximately six and a half hours between interviews. Ray was held in a jail cell and was wearing an orange jail uniform, clearly not free to leave. This shows a sufficient break in time and circumstances to alert Ray of the seriousness of the situation and the importance of _Miranda_.

Accordingly, inasmuch as this Court finds that there was no coercive two-step strategy to undermine _Miranda_ – or, assuming there had been, that there were sufficient curative measures – this case is governed by _Elstad_, under which the "relevant inquiry is whether… the second statement was also voluntarily made." _Oregon v. Elstad_, 470 U.S. 298, 318.

**Oregan v. Elstad**

Because the Court finds that Ray's post-_Miranda_ interview was free from coercion, the statements made in that interview are admissible so long as his pre-warning statements were voluntarily made. "[A] statement is involuntary ... if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are so offensive to a civilized system of justice that they must be condemned." _Lim_, 897 F.3d at 692(citing _United States v. Hernandez_, 200 F. App'x 283, 287 (5th Cir. 2006)(internal quotation omitted)). "The Supreme Court has rejected a presumption of coercive effect where the suspect's initial inculpatory statement, though technically in violation of _Miranda_, was

voluntary." <u>Gonzalez</u>, 2020 WL 3053390, at *8 (internal citation omitted).

In the instant case, Ray does not assert or suggest that his pre-<u>Miranda</u> statement was involuntary. Moreover, the Court has reviewed the video of Ray's pre-<u>Miranda</u> statement and does not find that it was involuntarily given. Therefore, the initial failure of law enforcement officers to administer the warnings required by <u>Miranda</u>, did not taint the Defendant's subsequent admission after he was fully advised of and waived his <u>Miranda</u> rights.

II.   <u>United States v. Tovar</u>

The Defendant also asserts that Ray's statements should be suppressed under the Fifth Circuit's holding in <u>United States v. Tovar</u>, 719 F.3d 376 (5th Cir. 2013). In <u>Tovar</u>, the Fifth Circuit considered whether a post-<u>Miranda</u> statement following a pre-<u>Mirandized</u> statement was admissible. <u>Tovar</u>, 719 F.3d at 387. The Court found Tovar's post-<u>Miranda</u> statements were admissible because they were "a product of free will" under <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). <u>Id</u>. at 388.

In <u>Wong Sun</u>, the Supreme Court held that the exclusionary rule may be used to suppress verbal statements as inadmissible fruit of a poisonous tree. "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest… is no less the 'fruit' of official illegality than the more common

13

tangible fruits of the unwarranted intrusion." Wong Sun, 371 U.S. at 485. However, the fruit of the poisonous tree doctrine is limited to evidence that is "derived from the exploitation of an illegal search or seizure." United States v. Dortch, 199 F.3d 193, 200 (5th Cir. 1999), opinion corrected on denial of reh'g, 203 F.3d 883 (5th Cir. 2000), was abrogated on other grounds by United States v. Birgham, 382 F.3d 500 (2004).

The prosecution contends that Tovar does not apply because it and Wong Sun only apply to statements that are derivative of a Fourth Amendment violation. The Defendant argues that Tovar does not require a Fourth Amendment violation in order to suppress statements, made after proper Miranda warnings and a valid waiver of rights, if the police obtained an earlier voluntary but unwarned admission. The Defendant reaches this conclusion because, in Tovar, the there was no illegal search, i.e., no Fourth Amendment violation. See Tovar, 719 F.3d at 386(finding that the search warrant was supported by probable cause). Yet, the Fifth Circuit found that Tovar's post-Miranda statements were admissible as a "product of free will under Wong Sun." Id. at 388.

However, the Fifth Circuit reviewed Tovar's statements under the assumption that they were unlawfully obtained. See id. at 387("Assuming arguendo that Tovar's first statements were unlawfully obtained, the central question is whether Tovar's subsequent post-Miranda admissions were voluntary – that is, not

14

a product of coercion or duress – and sufficiently an act of free will to purge the primary taint.")(internal quotation omitted). Therefore, while there was no actual Fourth Amendment violation, the Fifth Circuit conducted a thorough analysis that evaluated the law as if there had been a violation. Moreover, the court in Tovar quotes a prior Fifth Court decision that limits the fruit of the poisonous tree doctrine to evidence "derived from the exploitation of an illegal search or seizure." Id. at 386-87(quoting Dortch, 199 F.3d at 200). As such, this Court is not persuaded that Tovar extends the narrow ruling of Wong Sun beyond cases with a constitutional violation. A procedural violation of Miranda, without more, is not a constitutional violation.

In Elstad, the Supreme Court explained the difference between a Fourth Amendment violation and a procedural Miranda violation:

> "[A] procedural Miranda violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. The exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

Elstad, 470 U.S. at 306(internal citations and quotations omitted). If a suspect's constitutional rights are not infringed, then "the case is not controlled by the doctrine expressed in Wong Sun that the fruits of a constitutional violation must be suppressed." Id. at 308. Furthermore, when the alleged "fruit" of a noncoercive violation of Miranda is the accused's own voluntary testimony, the introduction of a post-Miranda statement is not a violation of the defendant's Fifth Amendment rights. See id.

Suppressing the defendant's testimony would not further the general goals of deterring improper police conduct or the Fifth Amendment goal of assuring trustworthy evidence. Therefore, "if errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself." Id. at 309. "It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Elstad, 470 at 309. "Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these

circumstances solely on whether it is knowingly and voluntarily made." <u>Id</u>.

In the instant case, the Court has found that there was no coercion, or any circumstances calculated to undermine the suspect's ability to exercise his free will. As such, <u>Wong Sun</u> does not apply to these facts. The Defendant does not assert that his post-<u>Miranda</u> statements were not voluntarily or knowing. The Court has reviewed the interrogation, post-<u>Miranda</u>, and finds that the Defendant knowingly and voluntarily waived his rights. Therefore, the Court finds that there is no reason to exclude Ray's post-<u>Miranda</u> statements which were knowingly and voluntarily made after being fully advised of his rights.

Accordingly,

IT IS HEREBY ORDERED that the Defendant's Motion to Suppress [ECF No. 22] is GRANTED in part and DENIED in part. The Defendant's pre-<u>Miranda</u> statements are suppressed, whereas his post-<u>Miranda</u> statements are not.

SO ORDERED this the 19th day of August, 2020.

_/s/ David Bramlette_____
UNITED STATES DISTRICT JUDGE

17